WEBER, Plaintiff in error, vs. THE STATE, Defendant in error.

*April 10—May 11, 1926.*

*Embezzlement: Money paid to officer of corporation for special purpose.*

One F., the owner of lands, paid to defendant, who was the secretary and treasurer of a mortgage company, a sum of money to be applied as principal on one of the mortgages on his lands, which mortgage had been sold by the company to one of its patrons. The defendant delivered to F. a receipt for the money in the company's name, but the money was placed in the company's funds, checked out for its benefit, and not applied on the mortgage note. *Held,* that although the defendant was a stockholder with a nominal interest and in name an officer of the corporation, he was in reality an employee only, having no control of the corporate affairs, and under the circumstances he could not, in law, be guilty of embezzlement under sec. 4418, Stats. *Milbrath v. State,* 138 Wis. 354, distinguished.

ERROR to review a judgment of the circuit court for Sheboygan county: MICHAEL KIRWAN, Circuit Judge. *Reversed.*

The plaintiff in error (hereinafter called the defendant) was found guilty by a jury of having embezzled the sum of $2,000, the money and property of one James Failley, by converting said sum to the use of the Sheboygan Mortgage & Security Company, contrary to the provisions of sec. 4418 of the Statutes.

In 1920 one Failley, who owned a farm of eighty acres

which adjoined the 160-acre farm of one Leonard, sold the same to the latter for $7,500, receiving in payment therefor the sum of $3,500 in cash and a second mortgage on both farms in the sum of $4,000. The Sheboygan Mortgage & Security Company (hereinafter called the company) is a Wisconsin corporation, located at Sheboygan, and engaged in a general investment, brokerage, and real-estate business. When Leonard had purchased the Failley farm he executed ten promissory notes to the company, aggregating the sum of $14,500, payable in five years, with interest at the rate of six per cent. per annum, interest payable semi-annually, and at the same time, in order to secure the payment of these notes, executed ten concurrent first mortgages upon the entire 240 acres. Thereafter Leonard executed a third mortgage in the sum of $3,700 to the Plymouth Exchange Bank. The company then sold the ten notes and the mortgages securing the same to its patrons, and thereafter acted as an agent for them in the collection of the interest.

In the summer of 1922 it was ascertained that Leonard had failed to pay interest upon all of the securities above mentioned and had also defaulted in the payment of the taxes. In the meantime a marked decline had been experienced in the values of farm lands everywhere, and Failley, the holder of the second mortgage for $4,000, became apprehensive of his security. He sought legal advice from one Prescott, an experienced attorney of Sheboygan, with the result that it was concluded to foreclose the second mortgage. The action was begun in August, 1922, and contemporaneously with the commencement thereof Failley paid to the company the sum of $930.75, being the accrued interest upon the ten notes and concurrent mortgages. It appears quite clearly from the evidence that both Prescott and Failley realized when the foreclosure action was begun that ultimately Failley would be obliged to pay these concurrent mortgages, and Failley was confident of his ability so to

do.  The foreclosure proceedings on the Failley mortgage
of $4,000 proceeded to judgment, and late in the fall of
1923 the property was sold at the foreclosure sale to Failley
for the amount of his mortgage, with the result that he
obtained title free and clear of the third mortgage of $3,700
held by the Plymouth Exchange Bank, and subject only to
the ten concurrent first mortgages.

Prescott and Failley, on the 4th day of November, 1922,
called at the office of the company, where they met the de-
fendant, *Weber,* the secretary and treasurer of the com-
pany, and then and there paid in to the company the sum
of $435, being the interest due up to that date on the ten
concurrent mortgages, and the further sum of $2,000 to be
applied on principal.  The agreement of the parties with
respect to the payments above referred to was reduced to
writing in the form of a receipt, drafted by Prescott, which
is of the following tenor :.

"Received of A. C. Prescott, for and on account of James
Failley, the sum of four hundred thirty-five dollars, *inter-
est to November 4, 1922, on a certain note given by Francis
L. Leonard and Ellen Leonard, and which note was se-
cured by a real-estate mortgage on* [here follows a descrip-
tion of the 240 acres] ; *two thousand dollars ($2,000) pay-
able on the principal of said note,* the said James Failley
having heretofore and on the 30th day of August, 1922,
*paid on account of interest on said note and mortgage* the
further sum of $930.75, *and the said note and mortgage
shall ratably secure the said James Failley for said pay-
ments.*
"Dated November 4, 1922.
       "SHEBOYGAN MORTGAGE & SECURITY CO.
(Italics ours.)    "A. E. Weber, Secy. & Treasurer."

The company kept an account with Failley on its books,
and to this account the various amounts were credited.  An
entry in the ledger shows a credit of $2,000 on principal.
Thereafter, and until the company was declared a bank-

rupt in April, 1925, Failley regularly paid the interest due on $12,500 to the company, and the interest so received, together with the interest on $2,000 which the company paid, was disbursed to the holders of the ten concurrent first mortgages.

Failley and Prescott testified that before making the payments on November 4, 1922, *Weber* represented that one of these concurrent mortgages was in the amount of $2,000, and that while it did not become due until 1925 the owner thereof was anxious to receive his money, and that the $2,000 would be used for the payment of such mortgage. *Weber* denied this statement, and took the position on the trial that the $2,000 was to be left with the company and to be used by it, and that for such use the company would allow Failley interest on the amount at the rate of six per cent. per annum, which interest was to be paid out by the company in order that all of the holders of the ten concurrent mortgages would receive their interest payments.

Neither Failley nor Prescott, up to the time that the company was declared a bankrupt, made any inquiry whatsoever with respect to the disposition of the $2,000. No satisfaction of the mortgage for $2,000 was requested or delivered, nor was there an assignment thereof made or demanded. The $2,000 mortgage, together with all the other concurrent mortgages, remained in the possession of the various owners thereof. Except as above stated, neither *Weber* nor the company had any control over or interest in these concurrent mortgages. Everything went along serenely with the parties until after the company had been declared a bankrupt, and then for the first time Prescott and Failley became apprehensive, with the result that the criminal action herein was begun and prosecuted to final judgment.

Further facts will be stated in the opinion.

*Arthur H. Bartelt* of Milwaukee, for the plaintiff in error.

For the defendant in error there was a brief by the *Attorney General* and *Charles Voigt,* district attorney of Sheboygan county, and oral argument by *Mr. Voigt* and *Mr. J. E. Messerschmidt,* assistant attorney general.

DOERFLER, J. The defendant is charged in the information with embezzlement of $2,000 on November 4, 1922, being the amount paid to the company on that date, upon the theory that this sum was paid to the company, and that *Weber,* as secretary and treasurer of the company, received it, deposited it to the credit of the company on its open checking account in a Sheboygan bank, and that thereafter he caused it to be checked out for the benefit of the company in the regular course of its business.

*Weber* at the time of the trial was twenty-seven years of age. He first became connected with the company in 1916, and was employed as a stenographer and as office help. In recognition of his ability and industry he was promoted from time to time, and in March, 1922, became the secretary and treasurer of the company, having special charge of the loaning and investment business. For his services as such secretary and treasurer he was paid a salary of $150 per month, and with the exception of such salary his interest in the business was merely nominal. His reputation, as disclosed by numerous prominent business men from Sheboygan who testified as character witnesses, was beyond reproach, and this reputation so established was not assailed or deprecated by an iota of testimony of the State. In November, 1922, he was an officer of the company, but while he held the office of secretary and treasurer he acted more in the capacity of a salaried employee. Ordinarily, an officer of such high rank in a corporation is the owner of a substantial amount of the stock of the same. It was not so with the defendant. But,

whether acting as officer or as employee, his services belonged to the company, and to it alone he was bound to be loyal.

Sec. 4418 of the Statutes is known as the embezzlement statute, and in its broad and comprehensive language covers substantially the entire field of embezzlement. Embezzlement was not known to the common law, and the crime is of statutory origin. As defined in statutes generally, and particularly by sec. 4418 of our Statutes, it involves a violation of a trust or fiduciary relationship. On November 4, 1922, the defendant, as an officer of the company, under the provisions of the statutes, occupied a position of trust in the company, and as to the company he was a fiduciary. Any fraudulent misappropriation of the assets of the company, either for his own benefit or for the benefit of others, would constitute an embezzlement. The defendant occupied no fiduciary relationship to Failley and was not the agent of the latter. Had he acted as the agent of Failley, such act might be incompatible with the duty that he owed the company. This was recognized by both Prescott and Failley, for when the agreement of November 4, 1922, was executed it was not signed by *Weber* individually, but by the company through *Weber* as its secretary and treasurer. If an agency was created at that time the *company* was constituted the agent, and not the *defendant*. No motive existed for the conversion of Failley's money to the benefit of the company, for the reason that the only interest the defendant had in the company consisted in the monthly salary that was paid him. Under these facts and circumstances it is difficult to perceive how the defendant could be held to have violated a trust relationship to Failley which under the provisions of sec. 4418 of the Statutes would constitute embezzlement.

The defendant was not charged in the information, nor was he convicted by the jury, of embezzling the property

of the company, but on the contrary of embezzling the
property of Failley for the benefit of the company.  Counsel
for the respective parties have not brought to our atten-
tion a single case where a defendant was charged and
convicted of embezzlement under circumstances similar to
those appertaining to the instant case, and a careful review
of the authorities has revealed none to us.  By far the
vast majority of transactions in modern times are per-
formed through the instrumentality of agents, and this is
especially and necessarily so in business transacted by cor-
porations; and yet, when we consider that an embezzle-
ment statute substantially like our own has been enacted
in nearly every state of the Union, it is, to say the least,
remarkable that no case similar to the one before us has
been cited.  The State has not even referred to or com-
mented upon, in its brief or argument, the case of *Milbrath
v. State,* 138 Wis. 354, 120 N. W. 252, which bears some
slight similarity in its facts to the instant case, and which
is cited with approval in many of the text and reference
books.  The *Milbrath Case* has become one of the leading
cases in the country, and the able and exhaustive opinion
of the court, written by that profound jurist, Mr. Justice
TIMLIN, has extended the liability of an officer of a cor-
poration to a greater extent than appears in any reported
case coming to our notice.  But the law laid down and
established in the *Milbrath Case* is based upon the peculiar
facts involved therein.  We do not recede one iota from
the law as pronounced in that opinion, for in that case the
writer of the opinion interpreted the spirit of the law, and
went beyond mere matters of form.

In the *Milbrath Case,* Milbrath was the owner of $24,000
of the capital stock of the company, and his codefendant,
Wagner, owned $6,000 of the stock.  When the mortgage
debtor, Kafura, paid his debt to Wagner in the presence
of Milbrath, the liabilities of the corporation largely ex-

ceeded its assets, and that condition continued down to the bankruptcy.  At this time Milbrath had overdrawn his account with the corporation to the amount of $31,000, while Wagner's account was overdrawn to the extent of $10,000.  The money received from Kafura was put into the cash drawer and mingled with other money of the corporation, and the corporation had the use of the money. The mortgage creditor was not informed that her debtor had paid the mortgage which she held, but in order to allay suspicion the company continued for years to pay her the interest, as though the mortgage was still outstanding and unpaid.  Based on this statement of facts the court uses this language:

"If the defendant and Wagner chose to make this insolvent corporation, in which they were the sole and controlling stockholders and of which they were officers, the repository of trust funds collected by them, it had no other effect in the law than if they delivered such funds into the possession of any trustee or subordinate employee controlled by them, whose possession must be deemed their possession and whose acquisition must be deemed their acquisition.  The corporation is in such case a mere instrumentality through and by means of which the natural persons in control thereof carry out their acts."

In speaking of the money of the creditor paid into the corporation the opinion continues:

"It is paid into that which is a mere instrumentality created by him under sanction of law, but as much under his control and as subservient to his will as the furniture of his office or the books of account in which he records his transactions.  Under such circumstances there is no room for the legal fiction of separate corporate personality or for distinction between the defendant's acts as officer of the corporation and his acts as an independent natural person."

The distinction between the facts in the *Milbrath Case* and the instant case is apparent and need be the subject of

but little comment. In the *Milbrath Case,* Milbrath was to all intents and purposes the corporation. He held the controlling stock. He dictated the board of directors. He controlled the meeting of stockholders. He was in all respects, in theory, the corporation itself, and he dealt with the corporation in a manner as though he were the individual owner of all of the assets. He looted the assets of the corporation as though they belonged to him individually. He received the money from the mortgage debtor at a time when the corporation was insolvent, well knowing of such insolvency, and he appropriated the proceeds to the individual purposes of the corporation, which were his own purposes. Knowing that the corporation was insolvent when he received the proceeds of the mortgage, he mingled the same with the moneys of the corporation, and withdrew the moneys to advance his own individual ends. Under such conditions it is said in the opinion that he became a trustee for the creditor.

In the instant case, *Weber,* as a stockholder, had but a nominal interest in the corporation. He did not control the corporation or the board of directors. Misappropriation of the moneys derived from Failley did not advance his personal interests. While an officer in name, he served the corporation in fact as a mere employee. In the instant case there is not even an intimation in the record that the company was insolvent when it received the $2,000 from Failley. It was a going concern, and not only met, in due course of business, the claims of its creditors, but had advanced thousands of dollars to local investors in Western mortgages negotiated by it, for the payment of defaulted interest. It held and maintained the confidence of the general public; besides, there is no evidence in the case to show that the defendant had overdrawn his account for even a penny. Under these circumstances it is diffi-

cult for us to conceive how the defendant could in law be guilty of embezzlement under the provisions of sec. 4418 of the Statutes.

We have gone over the record in this case thoroughly and considered it carefully. Aside from what has been heretofore said, even assuming that the act charged and complained of could in law constitute an embezzlement, nevertheless the agreement above set forth and the testimony of Prescott are so involved in entanglements and uncertainties as to create in our minds more than a robust, reasonable doubt of the guilt of the defendant.

We could devote many pages in extending this opinion, upon the misconceptions of Mr. Prescott as shown by his testimony, but no useful purpose will be served thereby. We will content ourselves by expressing the conclusion that the motion of the defendant at the close of his testimony, for his discharge, should have been granted.

*By the Court.*—The judgment and sentence of the lower court is reversed, and the cause is remanded with directions to discharge the defendant.

VINJE, C. J., dissents.