THE STATE OF MONTANA, Plaintiff and Respondent,
v. NORMAN HOLDREN, Defendant and Appellant.

No. 10570

Submitted October 9, 1963.   Decided December 18, 1963.

387 P.2d 446.

104

John J. Cavan, Jr., Billings (argued), for appellant.

William J. Speare, John L. Adams, Jr., Billings, Charles Bradley, Billings (argued), Donald Garrity, Helena (argued), for respondent.

MR. JUSTICE CASTLES delivered the Opinion of the Court.

The appellant, Norman G. Holdren, hereinafter referred to as defendant, was convicted on two counts on a charge of grand larceny of property held by him as an agent, under R.C.M.1947, § 94-2701, subd. 2. A two year sentence was imposed on each count; said sentences to be served concurrently. This appeal is taken from the judgment of conviction entered on the verdicts.

On May 25, 1961, defendant, his wife, and another, set up a corporation known as United Businesses, Inc. Each of these persons owned one share of this corporation. On May 30, 1961, the corporation purchased a business known as Collector's, Incorporated, which appears from the record not to have been in fact a corporation. United Businesses, Inc., then changed the name of its purchase to Professional Collector's and Personal Budget Service. Subsequently, the third incorporator of United Businesses, Inc., was bought out by defendant and his wife. Thereupon the corporation, with defendant as its executive officer, began operating the collection business by soliciting and accepting accounts for collection from various business people and others in and around Billings.

Late in 1961, United Businesses, Inc., doing business then as Professional Collector's, found itself in financial distress which

continued more or less uninterruptedly from that time until the business was closed on May 31, 1962.

It was defendant's job, as president of United Businesses, Inc., and manager of Professional Collector's (which were in reality one and the same business), to solicit accounts for collection. He had made arrangements with Montana Reserve Finance Corporation, one of their clients, to collect debts of approximately $12,000. For this service Professional Collector's was to receive a commission of one-third of all sums collected. It appears that when each account was accepted by Professional Collector's they returned an acknowledgment to the client. The accounts were either paid by the debtor directly to the creditor, or were paid into the collecting agency, Professional Collector's. If the funds were paid in to the collecting agency it was their practice to post that amount in their books. In this accounting procedure a division of the monies was then made in the books. The collecting fees and commissions were listed in respective columns and the remaining amount was credited to the account of the client. In this manner defendant kept a running account of all monies owing to each of his clients. However, all the actual payments received were deposited to the account of Professional Collector's in a Billings bank. From this account the defendant drew monies to pay withholding taxes, rent, salaries (including defendant's own salary), car payments and other expenses of the business.

Defendant as executive officer of the corporation and collecting agency, after the third incorporator left, had the sole power to draw upon this bank account. Defendant had complete control of the books and except for some ministerial posting he kept complete possession.

It further appears from the evidence and the testimony that the expenses of the business exceeded the commission share due Professional Collector's. Thereupon defendant, as executive officer, consistently drew upon the bank account in his endeavor to meet the expenses of Professional Collector's. It

is admitted that defendant knew that he was thereby using the funds of his clients to meet those expenses. Defendant asserted that he did this upon advice of counsel and in the belief that so long as he recognized the debt, evidence in his bookkeeping, there was no felonious wrongdoing.

Upon knowledge of defendant's business procedures and the filing of a Federal tax lien, the various clients refused to turn over any more accounts, demanded accountings and remittances. This in turn compounded defendant's financial difficulties by making it virtually impossible to remit the amounts owing. His financial house of cards had collapsed.

During the time of these events defendant appears to have embarked upon a program to obtain financing to sustain the faltering business. This effort, too, was financed with clients' funds. His efforts were unsuccessful. It appears he tried to forestall his clients' demands through his secretarial help. The device used was to have them inform the inquiring client that there would be an accounting made in the near future. If the client called around the first of the month he was to be informed that an accounting would be forthcoming on the fifteenth. If they called around the fifteenth the accounting was to be rendered on the first of the next month.

The jury was presented with testimony that defendant was soon to leave the Billings area and had made some effort to hide knowledge of this fact. Other testimony was given that defendant was having a trailer constructed for himself and had asked the manufacturer to "keep it a secret that he [defendant] was, that he had another job and was leaving town and he was going to leave by Friday."

On or about June 4, 1962, the president of the Montana Reserve Finance Corporation spoke on the telephone with the defendant. It appears in the record that defendant felt he had committed no wrong but "he didn't intend to pay us [Montana Reserve Finance Corp.] or anyone else."

These facts and their effect upon defendant's clients initiated the filing of complaints and the resulting informations.

On June 20, 1962, and on August 29, 1962, the county attorney of Yellowstone County filed in the district court two informations charging grand larceny.

The first information, No. 6422, charged the defendant, Norman G. Holdren, with acting as the agent of the Montana Reserve Finance Corporation and on or about June 5, 1962, of having misappropriated $285.33 of that firm's money. This account was collected by defendant from a Mr. Christiansen. Upon this charge the jury found the defendant guilty.

The second information, No. 6449, contained three counts. The first count charged defendant with acting as agent of Montana Reserve Finance Corporation on or about April 14, 1962, and having misappropriated $625 of that firm's money. This account was collected by defendant from a Mrs. Thackeray. Upon this charge the defendant was found not guilty. The second count of this information was the same as the first except as the amount here was $167. This account was collected by defendant from a Mr. Bier. Upon this charge the defendant was found guilty. The third count of this information charged defendant with acting as agent for the Midland Implement Company on or about May 16, 1962, and having misappropriated the sum of $104.63. At the close of the trial the State moved the court to dismiss this count. The motion was granted.

It was stipulated that these causes be consolidated for trial. Cause No. 6422 became Count I; the Thackeray account in Cause No. 6449 became Count II; the Bier account in Cause No. 6449 became Count III; and the Midland Implement account in Cause No. 6449 became Count IV.

Defendant makes three specifications of error. The first is "That the Court erred in refusing to dismiss the informations * * * for the reason that there is a fatal variance between the pleadings and the proof * * *." The second is "That the

Court erred in refusing to dismiss the informations * * * upon the grounds and for the reasons that the evidence was insufficient to sustain the burden of proof as to the requisite intent to steal and to permanently deprive the Montana Reserve Finance Corporation of its money." The third is "That the evidence is insufficient to support the verdict."

R.C.M.1947, § 94-2701, is denominated as our larceny statute. It is divided into two subsections, and covers both the crimes of larceny and embezzlement. Defendant has been convicted on both counts of the crime of embezzlement. "The crime of embezzlement is based solely on statute and is designed to penalize those conversions which could not be prosecuted at common law as larceny because there was no trespassory taking. In most jurisdictions, this distinction between embezzlement and larceny has been preserved. In some jurisdictions, however, the definition of larceny has been expanded so as to include embezzlement." II Wharton, Criminal Law, § 514, (Anderson, 1957) pp. 191-192. (Citing Montana as being one of those jurisdictions.)

Such is the case here in Montana. R.C.M.1947, § 94-2701, subd. (1), is the statutory codification of the common-law crime of larceny. Subdivision (2) codifies the crime of embezzlement. These subsections combined now constitute the crime of larceny in Montana.

Defendant's contentions concerning his first specification of error are best reflected in two paragraphs from his own brief, as is set forth below:

"The question presented for consideration then is can the State charge the defendant as an individual with committing a crime as the agent of one corporation [,] in this case the Montana Reserve Finance Corporation [,] where the proof shows that the defendant was in reality the agent of another corporation, namely, the United Businesses, Inc., which itself was not an agent of the Montana Reserve Finance Corporation but at best a bailee as an independent contractor?
* * *

"It is our position therefore that the State having charged the Defendant with larceny committed as an agent of the Montana Reserve Finance Corporation under subdivision 2 of our statute must show that the defendant was such an agent and that if it fails to make such proof and the fact shows that the defendant individually is not an agent of the Montana Reserve Finance Corporation at all then there is a fatal variance between the pleading and the proof and the defendant cannot be convicted upon the information."

In reality, each of these paragraphs contain a complete and unrelated question. The first is saying in effect that "Collecting agents * * * who follow that as an independent business, cannot commit embezzlement of the moneys so collected, in the absence of a statute making them liable." 29 C.J.S. Embezzlement § 15, p. 692. That as an *independent contractor* they are not *agents* within the meaning of the statute. The second paragraph brings out the proposition that even if an independent contractor is an agent under the statute this defendant must be shown to have been indvidually an agent of the Montana Reserve Finance Corporation. That the fact of the existence of United Businesses, Inc., doing business as Professional Collector's, is sufficient to insulate him from being individually charged in this case, unless he be charged as an officer of that corporation. Each such question in this specification of error shall be answered in turn.

Assuming for sake of argument that collecting agents are not true agents, but are independent contractors, do they come within the meaning of *agent* in R.C.M.1947, § 94-2701(2)?

We find agency defined in 1 Restatement, Agency, Chapter 1, Topic 1, § 1: "(1) Agency is the relationship which results from the manifestation of consent by one person to another that the other shall act on his behalf and *subject to his control,* and consent by the other to act. (2) The one for whom action is to be taken is the principal. (3) The one who is to act is the agent." (Emphasis supplied.)

No evidence was given that creditors that turn over accounts to collection agencies on commission retain any control over those collecting the accounts. Therefore, probably in the technical sense such persons would not be agents of the creditor. However, was the word *agent* as used in section 94-2701, subd. (2), meant to be used strictly in the technical sense? We think not. R.C.M.1947, § 94-101, states: "The rule of the common law, that penal statutes are to be strictly construed, has no application to this code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its object and to promote justice." There is also a very comprehensive discussion on this very point in State v. Lawrence, 84 Ohio Law Abst. 16, 18-19, 13 Ohio Op.2d 195, 168 N.E.2d 21, 23-25, where it is said:

"It is well known that criminal statutes should be strictly construed. In fact it is said that all doubts in the interpretation of such statutes should be resolved in favor of the accused. (Citation omitted.) 'It is fundamental in the construction and application of statutes that *not only the purpose to be served, but the object to be attained as well as the evil to be remedied, should be considered'*. (Citation omitted.) [Emphasis supplied.]

\* \* \*

"In our mind the purpose of the statute would be defeated by letting one who is an agent [,] in the popular sense that he is doing something for another [,] 'off the hook' just because he is an independent contractor—If such an agent embezzled *property of another* of which he got possession as a result of his agency.

\* \* \*

"There was no proof that the defendant was Mr. Babylon's agent in the sense that Mr. Babylon had control over him. An agent, in the usual and ordinary meaning, is one who acts for or in the place of another by authority from him. (Citation omitted.) It is true that in a technical sense an important

element in determining the existence of an agency relationship is the presence of some degree of control of the conduct and activities of the proposed agent. (Citation omitted.)

"The question is in which sense, technical or popular, did the legislature use the word 'agent' * * *. We have already indicated that we feel that they used it in the ordinary or popular sense in which the word 'agent' is taken as meaning one who does something for and on behalf of another."

This court recognizes that the Ohio code has separate embezzlement and larceny statutes. That the Ohio court in that decision based its reasoning upon the fact that Ohio's embezzlement statute had been constantly amended over the years by adding on more and more enumerated classes, each of which could be found guilty of embezzlement. Such has not been the case here in Montana. Our subdivision (2) of section 94-2701, supra, has not been amended since it was enacted in 1895. However, the reasons expressed in State v. Lawrence, supra, are as valid here as they were there. If such were not the case, and we were to hold that each enumerated class were to be interpreted in a strict technical sense without regard for the purpose to be served, the object to be attained, or the evil to be remedied, we would make the enactment worthless to a cunning operator.

"* * * [T]he courts which hold [that some classes, persons, or groups] are not 'agents' did so not so much because of the nature of the agency but more especially because the alleged embezzler had a right of property in the specific article alleged to have been embezzled. This right of property came from a customary right of the collector to mix monies and substitute his obligation for the monies collected. There is no proof of such a custom in this case and we doubt if there could be. Furthermore we think the legislative intent was to use 'agent' in its ordinary and popular sense." State v. Lawrence, supra, at p. 21 of 84 Ohio Law Abst., at p. 26 of 168 N.E.2d.

Except for· the fact that there was no commingling of funds, State v. Lawrence, supra, is almost square on the facts of this case. But on that point that court went on to say at p. 19 of 84 Ohio Law Abst., at p. 24 of 168 N.E.2d: "Hence here we do not have a situation where the money collected has been comingled [sic] and even if it did our holding would be the same * * *."

However, this court does not here declare that all independent contractors are agents within the purview of section 94-2701, subd. (2). It is just in those instances where there is a legitimate purpose to be served, a valid object to be attained, and a vicious evil to be remedied. Therefore, we do hold that collection agents, as are represented by the facts of· this case, do come within the meaning of *agent* in R.C.M. 1947, § 94-2701, subd. (2).

Now, turning to the second question presented in the first specification of error. Must it have been shown that this defendant individually acted as the agent of Montana Reserve Finance before his conviction can be sustained?

We have already demonstrated that the corporation was an agent under the statute. But in this case, under these facts, should the existence of this corporate entity shield this defendant from individually being held responsible for a criminal act? We think not.

"If any general rule can be laid down * * *, it is that a corporation will be looked upon as a legal entity * * * until sufficient reason to the contrary appears; but, when the notion of legal entity is used to defeat public convenience, justify wrong, protect fraud, or *defend crime,* the law will regard the corporation as an association of persons." Emphasis supplied. United States v. Milwaukee Refrigerator Transit Co., 7 Cir., 142 F.247, 255. Also see Anderson v. Abbott, 321 U.S. 349, 362, 64 S.Ct. 531, 88 L.Ed. 793. "It [the corporate entity] has also been said to be property disregarded in criminal prosecutions against the real offender (Citing Redmond v. United States,

1 Cir., 8 F.2d 24) although this may be criticised as circuitous reasoning to hold one responsible for his own crime." 1 Fletcher, Cyclopedia Corporations, § 41 (perm. ed. 1931) p. 139.

There is nothing particularly unusual or startling about "piercing the corporate veil" or as it is sometimes called "disregarding the corporate entity". This has been done in Montana in civil matters on several instances. See Barnes v. Smith, 48 Mont. 309, 317, 137 P. 541; Sun River Stock & Land Co. v. Montana Trust & Savings Bank, 81 Mont. 222, 241, 262 P. 1039; Brady Irrigation Co. v. Teton County, 107 Mont. 330, 334, 85 P.2d 350.

We also have State v. Hall, 45 Mont. 498, 125 P. 639, which is a criminal case involving facts somewhat similar to the instant case. Although the Hall case does not specifically hold that a corporate entity may be disregarded in a criminal case the court there was doing just that when they said on page 505 of 45 Mont., on page 643 of 125 P.: "There is an abundance of evidence in the record to warrant the conclusion that Hall Bros., the corporation, was simply a cloak or cover for the operations of the defendant Sam A. Hall." The court went on to say at page 507 of 45 Mont., at page 643 of 125 P.: "Let us make it plain from the outset that in our judgment there is ample evidence that the corporation Hall Bros. in all the transactions set forth in the record was simply a disguise for Sam A. Hall * * *."

We have no problem with substituting the words United Businesses, Inc., and Norman G. Holdren for Hall Brothers and Sam A. Hall in the above language. It would be as valid for this case as it was in that one.

Counsel for defendant, in oral argument, admitted that the Hall case could not be distinguished but said that it was "bad law". The effect of defendant's argument, as applied to the facts of that and this case, standing by itself, would put the business community of this state at the mercy of every col-

114

lection agency which had the foresight to incorporate. Here, as there, with these facts such cannot be the case.

Defendant urges that Weber v. State, 190 Wis. 257, 208 N.W. 923, 925, 45 A.L.R. 928, is in point and furnishes the basis for the reversal of his conviction. But we find this case clearly distinguishable. The court there said on page 261 of 190 Wis., on page 925 of 208 N.W., 45 A.L.R. 928: "* * * he was an officer of the company, but, while he held the office. of secretary and treasurer, he acted more in the capacity of a salaried employee. Ordinarily, an officer of such high rank in a corporation is the owner of a substantial amount of the stock of the same. It was not so with the defendant." It *was so* with this defendant. Here we see one who, with his wife, owns all the stock in the corporation.

In the Weber case, supra at page 262 of 190 Wis., at page 925 of 208 N.W., 45 A.L.R. 928, it is said: "If an agency was created at that time, the *company* was constituted the agent, and not the *defendant.*" That is reasonable in the light of those facts, but under the facts of this case this defendant *was* the company. When the veil is swept away this defendant stands naked in his personal responsibility.

The Weber case, supra, distinguishes the case of Milbrath v. State, 138 Wis. 354, 120 N.W. 252. That case is much more analogous to the case at bar. There the court had, as do we, ample reason to disregard the corporate entity.

Therefore, under these facts, the corporate entity does not shield this defendant from individually being held responsible for his criminal act.

For the above reasons we find there was no fatal variance between that which was plead and the facts proved.

Defendant urges as his second specification of error that "The evidence was insufficient as a matter of law to establish the requisite intent to permanently deprive the owner of his property." R.C.M.1947, § 94-117, requires that "In every crime or public offense there must exist a union or joint

operation of act and intent * * *." R.C.M.1947, § 94-118, states that "The intent or intention is manifested by the circumstances connected with the offense, and the sound mind and discretion of the accused. * * *"

There is no doubt that a felonious intent, or *animus furandi,* is a necessary element of the crimes of larceny or embezzlement. This court in previous cases has had much to say on this point. See State v. Labbitt, 117 Mont. 26, 32, 156 P.2d 163, 165; State v. Smith, 135 Mont. 18, 24, 334 P.2d 1099. "The intent required * * * may be found from the facts and circumstances surrounding the transaction * * *. Generally * * * there is evidence of a deliberate attempt to hide, to lie, or to cheat or some other action inconsistent with an ordinary debtor-creditor relationship." State v. Smith, supra, at pp. 24-25 of 135 Mont., at p. 1102 of 334 P.2d. Such evidence abounds in this case.

Defendant asserts that an ordinary debtor-creditor relationship resulted from the transaction hereinbefore described. There is no doubt that if such a relationship did exist this conviction cannot be allowed to stand.

The jury in the court below found, as a matter of fact, that there was indeed the requisite intent to steal, or permanently deprive Montana Reserve Finance of their money. But defendant urges that "The evidence was insufficient *as a matter of law* to establish the requisite intent * * *". This appears to be the same as saying "* * * the appellant [defendant] uses the term as meaning that the findings do not sustain the judgment, and that the judgment is therefore erroneous." Rehberg v. Greiser, 24 Mont. 487, 492, 62 P. 820, 63 P. 41, 42. The question of intent is a fact determination which, in this case, was left to the jury.

"What the evidence tends to prove is a question of law, and hence a finding by a court [jury] of a fact which is not supported by any evidence whatever is equivalent to a decision or ruling that there was some evidence tending to prove what

is found when in truth there was none; and this also presents a question of law which, * * * becomes a proper subject for review * * *." Rehberg v. Greiser, supra, at pp. 492-493 of 24 Mont., at p. 42 of 63 P.; Perkins v. Glacier Dairy, 125 Mont. 453, 456-457, 239 P.2d 531. But here the converse is true. The evidence was sufficient for a jury to conclude, that as a matter of fact, this defendant had such felonious intent. Thus, the lack of any showing of intent would have to be manifest so as to not support the verdict before the question would be a matter of law. There seems to us to be ample evidence upon which the jury must have found the requisite intent. There exists the secrecy of the trailer's construction; defendant's statement to the president of Montana Reserve Finance that "he didn't intend to pay us [Montana Reserve Finance] or anyone else" the device of refusing to account by delaying and having his secretarial help give his clients "the run around".

Defendant relies strongly upon State v. Smith, supra. That case involved two lumber firms that shipped a commingled car of lumber. The president of one firm, the S. and S. Milling Company, received the full proceeds of the sale and deposited this to his firm's account. The money was used to pay that firm's bills so at the time of insolvency the other firm had not been paid. The embezzlement conviction of the president of S. and S. Milling Company was reversed upon the grounds of lack of intent to permanently deprive. What this court did there, without saying so, was to declare that as a matter of law, there was not sufficient evidence to sustain the verdict. Here the pendulum, weighted with evidence, swings the other way.

The question of intent "must necessarily be determined from the *facts and circumstances of the particular case* * * * and therefore must usually be inferred, from the facts testified to by witnesses and the circumstances as developed by the evi-

dence." Emphasis supplied. State v. Madden, 128 Mont. 408, 416, 276 P.2d 974, 978.

State v. Smith, supra, can readily be distinguished. In the Smith case the complaining witness was told, and he acquiesced, that the defendant had deposited the proceeds to his own account. In the instant case there is conflict as to knowledge, on the part of the complainant, as to the disposition of the funds, and he certainly did not acquiesce. The Smith case showed they both "were in the habit of maintaining running open accounts to record intercompany payments and lumber shipments." State v. Smith, supra, at page 23 of 135 Mont., at page 1101 of 334 P.2d. Although in this case there was a crediting of accounts by Professional Collector's, the record shows it only to have been a unilateral arrangement. The fact of bookkeeping does not preclude the jury from finding the requisite intent.

In the Smith case the parties continued to do business together right up to the time the defendant's business failed. There was a period of over two years between the transactions and the filing of a complaint. "[T]he complaining witnesses treated the transaction as one in the regular course of business and the conversations, testified to, were an attempt to collect a debt owing them as a partnership from a defunct corporation by looking to the managing officer for personal payment." State v. Smith, supra, at 25 of 135 Mont., at 1102 of 334 P.2d. This all is diametrically opposed to the facts of the instant case. The parties did not continue in the regular course of business with each other. There was a timely demand for an accounting and the filing of the complaint. The record is devoid, other than defendant's own statement, of any evidence that these parties intended to create, either expressly or impliedly through a continuing course of conduct, a debtor-creditor relationship. We have only defendant's word for that, and the jury must have refused to believe that word,

which stands alone unsupported by the evidence. This case contains all that the Smith case lacked.

The third specification of error states, "That the evidence is insufficient to support the verdict."

In light of what we have said about the first two specifications of error, and especially our comments concerning State v. Smith, supra, there is no doubt there was ample evidence, that was believed by the jury, to sustain the verdict.

The judgment is affirmed.

MR. CHIEF JUSTICE JAMES T. HARRISON and MR. JUSTICES JOHN CONWAY HARRISON, ADAIR and DOYLE, concur.